UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY TOMFORD,

                    Plaintiff,              Civil Action No.: 13-cv-11140
                                            Honorable Terrence G. Berg
               v.                   Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]**

      Plaintiff Jeffrey Tomford brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

      For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") impermissibly substituted his own opinion for that of the treating physician in the case, and thus his decision is not supported by substantial evidence of record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment **[13]** be **DENIED**, Tomford's motion **[9]** be **GRANTED IN PART AND DENIED IN PART** and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be **REMANDED** for further

proceedings and consideration consistent with this Recommendation.

## II.     REPORT

### A.     Procedural History

On June 9, 2010, Tomford filed applications for DIB and SSI, alleging disability as of July 31, 2008.  (Tr. 144-153).  The claims were denied initially on September 15, 2010.  (Tr. 79-87).  Thereafter, Tomford filed a timely request for an administrative hearing, which was held on July 25, 2011, before ALJ Donald D'Amato.  (Tr. 37-56).  Tomford, represented by attorney Jennifer Rizk, testified, as did vocational expert ("VE") Annette Holder.  (*Id.*).  On September 8, 2011, the ALJ found Tomford not disabled.  (Tr. 18-36).  On January 25, 2013, the Appeals Council denied review.  (Tr. 1-7).  Tomford filed for judicial review of the final decision on March 14, 2013.  [1].

### B.     Background

#### 1.     Disability Reports

In an undated disability report, Tomford reported that the conditions preventing him from working are degenerative disc disease and left elbow pain and atrophy.  (Tr. 172).  He reported that he stopped working on July 31, 2008, due to his conditions.  (*Id.*).  He reported taking a number of pain medications, including methadone, Lorcet and oxycodone, as well as Xanax for anxiety.  (Tr. 175).  He reported however, that he had never been treated for a mental condition.  (*Id.*).

In an adult function report, Tomford reported that he his homeless but stays with his mother.  (Tr. 184).  He reported that his left arm "is all but useless," as he cannot feel his fingers or thumb or move them well.  (*Id.*).  In addition, his right thumb had been cut off and reattached without the knuckle so he cannot bend it.  (*Id.*).  He has since had problems with strength and

2

pain in his right hand and wrist. (*Id.*). He has difficulty holding things, which has gotten worse in the past five years. (*Id.*). He does not do a lot during the day besides watching television. He does not sleep well due to arm pain and degenerative disc disease and arthritis in his back. (Tr. 185). He reported that it takes him a long time to button his pants and shirts. (*Id.*). He is able to prepare simple meals once a day, but the length of time it takes "depends on how much I drop what I'm making." (Tr. 186). He reported mowing the grass and cleaning, but that he does a little at a time and takes a break when he begins to hurt. (*Id.*).

Tomford reported that he goes out 3-4 times a day, can go out alone, but does not drive. (Tr. 187). He either takes public transportation or receives a ride from someone. (*Id.*). He shops in stores occasionally for food but mostly has someone go for him. (*Id.*). He spends no time with others and reported having no interests. (Tr. 188). He reported that even riding in a car for a long period of time is uncomfortable. (Tr. 189).

Tomford reported that his conditions restrict his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and use his hands. (*Id.*). He reported he is left handed. (*Id.*). He can walk a block or two before needing to stop 15-20 minutes to rest. (*Id.*). He reported no problems paying attention, completing tasks, following instructions, getting along with others or handling stress or changes in his routine. (Tr. 189-90). Tomford reported that his back, leg and arm pain had "really increased" over the past 4-5 years noting symptoms including tingling, numbness, sharp pains and dropping things. (Tr. 191).

In a disability appeals report, Tomford reported that his right hand had gotten worse and he now wears a brace. (Tr. 204). He also reported worsening in his left hand as well, including increased pain and loss of sensation. (*Id.*).

### 2. *Plaintiff's Testimony*

At the hearing, Tomford testified that he stopped working on his alleged onset date because, although he had injured both his left arm and right hand years before, the function of both extremities had deteriorated to a point where he could not do anything anymore. (Tr. 41). He testified he is left handed and still writes with his left hand, but does so sloppily. (*Id.*). He also uses his left hand to support his right hand when lifting, because he has lost his grip strength in his right hand. (Tr. 41-42). Tomford testified that he can sit for 10-20 minutes before needing to reposition himself, can stand 15-20 minutes before needing to sit, and can walk 1-2 blocks before needing to rest. (Tr. 43). He can lift ten pounds, using his right hand with his left hand for support. (Tr. 43-44). He testified that one out of every five times he bends to pick something up he gets sharp pains down his legs, but that this has been going on since he was in his 20s. (Tr. 44). He can reach, but not to take down something heavy. (*Id.*). Tomford testified that he has difficulty with feeling in his fingers, and he also experiences stiffness in his fingers. (Tr. 45). He testified that his worst pain is the pains in his back and neck and in his hands and left elbow. (*Id.*). He testified that he takes liquid Oxycodone, Methadone, Dilaudid, and Lorcet for pain, with no side effects. (Tr. 45-46). He testified that this medication helps his pain. (Tr. 48).

Tomford testified that he lives with his mother and he cooks and does light cleaning such as dusting and vacuuming. (Tr. 46-47). He will clean for 10-15 minutes before resting for the same amount of time. (Tr. 47). He generally cooks on the grill. (*Id.*).

### 3. *Medical Evidence*

#### a. *Treating Sources*

##### i. *Dr. Raymond Rion*

Tomford treated with Dr. Raymond Rion, his primary care physician, on September 13,

2006, complaining of back, arm and neck pain. (Tr. 234). He reported taking some of a friend's Vicodin which helped him. (*Id.*). He reported a prior severe left elbow fracture with weakness and an amputated right thumb that was reattached in 1990. (*Id.*). He reported that he had been unemployed at that point for a year and a half. (*Id.*). Tomford reported worsening back pain in his upper and lower back. (*Id.*). He was "wondering about disability." (*Id.*). An exam revealed swelling at his second metacarpal on his right hand, and no joint in his right thumb. (*Id.*). There was "a lot" of atrophy of the left arm with decreased range of motion of the left hand. (*Id.*). His upper back was tender but his lower back was not. (*Id.*). Dr. Rion diagnosed him with back and left arm pain, prescribed Vicodin and ordered x-rays. (*Id.*). They would then "discuss whether disability would be a good idea." (*Id.*). Dr. Rion also scheduled Tomford for a stress test due to a family history of coronary artery disease. (*Id.*).

A number of x-rays were taken on September 19, 2006. X-rays of Tomford's left elbow and shoulder were both normal. (Tr. 224-25). X-rays of his right hand revealed a "bony ankylosis of the distal interphalangeal joint of the thumb and there is old ununited fracture of the tip of the distal phalanx of the thumb with a well-corticated free fragment." (Tr. 226). X-rays of Tomford's lumbar spine found degenerative disc disease at L5-S1 and changes of spondylosis involving the upper lumbar spine. (Tr. 229). X-rays of his cervical spine found degenerative disc disease at C3-C4 and C4-C5 with "associated marginal lipping and with encroachment into existing foramina." (Tr. 230). The report noted that "[i]f there is question of nerve impingement, MRI of the cervical spine may be considered." (*Id.*).

Tomford returned to Dr. Rion on September 27, 2006, reported that he still had left arm pain and shoulder numbness. (Tr. 234). Dr. Rion also noted that Tomford has "some mild degenerative disease in his spine" but that his "cervical and lumbar spine was negative." (*Id.*). It

does not appear any specific musculoskeletal or neurological exam was done at this appointment. (*Id.*). He was diagnosed with left arm pain and numbness "with obvious previous nerve disease," and an EMG was ordered. (*Id.*). He was also started on medication for hyperlipidemia. (*Id.*).

Tomford was seen again by Dr. Rion on October 16, 2006. (Tr. 235). He reported back problems "mainly at night but [] not frequent, a few nights a week," and was requesting additional narcotic medication for this pain. (*Id.*). His stress test and echo test were both normal, but he had been unable to schedule an EMG. (*Id.*). He was prescribed additional Vicodin for his back pain, and Dr. Rion stated he would work to get an EMG scheduled. (*Id.*). However, there is no record of an EMG from this time period in the record.

Tomford did not treat with Dr. Rion again until May 6, 2007, where he complained of a sore throat and back pain radiating into his leg while driving. (Tr. 235). He reported that he would probably be moving to Philadelphia to work as a welder. (*Id.*). It does not appear a musculoskeletal or neurological exam was conducted at this appointment. (*Id.*). Tomford was diagnosed with back pain, prescribed Vicodin and recommended to also use over the counter ibuprofen. (*Id.*).

Tomford did not return to Dr. Rion for treatment again until March 6, 2009. (Tr. 233). At that appointment, he complained of increased back pain for the prior two weeks with no identifiable cause. (*Id.*). The pain in his lower back was 4/10 in intensity, radiating to his groin, and had previously been as high as 7-8/10. (*Id.*). Standing and moving increase his pain, and it was relieved by heat. (*Id.*). It was not relieved with Tylenol or Motrin. (*Id.*). Tomford admitted to never taking his hyperlipidemia medication. (*Id.*). He reported no other complaints besides a cough and congestion. (*Id.*). Upon exam, Dr. Rion noted "[n]o increased pain on palpation of back or abdomen." (*Id.*). He ordered an x-ray to rule out kidney stones. (*Id.*). X-rays of

Tomford's lumbar spine taken on the same day revealed mild to moderate diskogenic degenerative changes within the lower thoracic and lumbar vertebral column but that the lumbar vertebral body height appeared maintained. (Tr. 227). An x-ray of his abdomen revealed nothing of significance. (Tr. 228).

Tomford returned to Dr. Rion on February 10, 2010. (Tr. 231). At this appointment he complained of left hand pain. (*Id.*). He reported seeing a "Dr. Binder" for his back pain and taking Dilaudid and Vicodin, although there are no treatment records available for this doctor. (*Id.*). Tomford reported that his left arm "is becoming less functional" and he complained of weakness and dropping things. (*Id.*). An exam revealed an asymmetric left arm, nontender left shoulder and a reduced range of motion in the left elbow with loss of extension. (*Id.*). His left forearm "has significant atrophy particularly on the dorsum" and both hands "reveal changes of osteoarthritis as well as muscular atrophy." (*Id.*). Dr. Rion noted limited range of motion in Tomford's left thumb and weakness in his "intrinsic hand muscles as well as at the wrist." (*Id.*). He exhibited good bicep strength, however. (*Id.*). Dr. Rion recommended an EMG and x-rays.

X-rays of Tomford's left wrist and hand, taken on February 13, 2010, revealed no acute fracture or malalignment of the wrist, but a "well circumscribed lucent lesion within the ulnar styloid with a sclerotic order which appears benign" and "surgical suture material." (Tr. 244). His left hand revealed no acute fracture or malalignment, but "[m]ild osteoarthritic changes involving the distal interphalangeal joints as well as first metacarpal phalangeal joint." (*Id.*). Another lucent lesion was seen on the head of the third metacarpal, but was thought to be benign. (*Id.*). X-rays taken of his left shoulder and elbow were normal. (Tr. 243).

Tomford underwent an EMG of his left upper extremity on March 9, 2010. (Tr. 245-47). He reported compensating for an injury to his left arm that he sustained at age 12, but that "now

7

the strength is worsening," and he has "difficulty using the hand from weakness and inability to perceive 'what my hand is doing.'" (Tr. 246). An exam revealed atrophy of the left forearm and hand, impaired ulnar sensory perception, "poor proprioception of the thumb and digits and poor perception of median innervated hand regions." (*Id.*). With regard to his strength, his thumb opposition and abduction were absent, finger adduction was 2+, finger abduction was 3-, finger extension was 5 for the medial digits and 2 for the lateral digits. (*Id.*). Nerve conduction studies "demonstrated an absent left median motor and sensory response" that was "50% of the response on the right upper extremity," with the "remainder of the ulnar responses [ ] comparable to the right upper extremity." (*Id.*). These findings were interpreted as "an old severe left median mononeuropathy" and "old moderately severe left ulnar mononeuropathy with loss of ulnar sensory function and moderately impaired motor function." (Tr. 247). At a follow-up with Dr. Rion on March 18, 2010, the two discussed the EMG results, but no examination was conducted. (Tr. 262). Dr. Rion noted that Tomford "continues to work with the pain people and is on a variety of agents." (*Id.*). He was to follow up with Dr. Rion "as needed." (*Id.*). There are no records in the file regarding Tomford's treatment with any pain doctors during this period.

Tomford returned to Dr. Rion on July 9, 2010, for a follow-up. He reported trying to taper down his methadone dose from his other physician, and that he "otherwise has been feeling fairly well and stable." (Tr. 261). He reported "struggling to find work and is doing some work around the house." (*Id.*). No exam was conducted and no changes were made to his treatment at this appointment. (*Id.*).

A right thumb x-ray taken on November 29, 2010, found "fusion/ankylosis of the interphalangeal joint of the right thumb" and an "old ununited fracture tip of the distal phalanx." (Tr. 292). At a December 11, 2010 follow-up appointment, Dr. Rion discussed the x-ray results,

8

and noted that Tomford "has been having no other problems" but "needs documentation of his inability to work." (Tr. 325). Dr. Rion performed no exam, but opined that "it is unlikely that [Tomford] will be able to do his kind of work that he can do in the future. I believe he is disabled and will remain so indefinitely." (*Id.*). On December 14, 2010, Dr. Rion penned a letter stating that Tomford was under his care for chronic back pain as well as an injury to his left arm "which results in significant neurological injury and severe loss of function." (Tr. 293). He also noted Tomford's fused right thumb "and loss of function in that hand as well." (*Id.*). He noted Tomford was on "very strong narcotic pain medication for pain control" and that, in his opinion, Tomford was "disabled and will remain so indefinitely." (*Id.*).

Tomford returned to Dr. Rion on May 5, 2011, to complete some forms for his attorney. (Tr. 324). Dr. Rion did not perform an exam at this appointment but noted that Tomford "also has now arthritis of the hand and severe arthritis of the right thumb with very limited range of motion," in addition to his back pain and left elbow injury and dysfunction. (*Id.*).

On the same day, Dr. Rion completed a "multiple impairment questionnaire" for Tomford. (Tr. 308-315). He diagnosed Tomford with back pain, thumb arthritis and severe nerve injury in his left arm and hand, based on "abnormal EMG and x-rays." (Tr. 308). He noted Tomford's condition as "stable." (*Id.*). Dr. Rion listed Tomford's symptoms as back pain, left elbow and hand pain and left arm weakness and numbness and referred the reader to "other reports" to discuss the level of Tomford's pain. (Tr. 309-310). He opined that Tomford could sit two hours in an eight-hour day and stand or walk for the same amount of time. (Tr. 310). Tomford would not be able to sit or stand continuously, but must change positions every 15-20 minutes. (Tr. 310-11). Dr. Rion further found that Tomford could occasionally lift or carry up to 20 pounds. (Tr. 311). He could not use his left hand for reaching, handling, fingering or

9

lifting, and Dr. Rion noted that Tomford had no flexibility in his right thumb.  (*Id.*).  Dr. Rion opined that Tomford had marked limitation in both hands for grasping, turning, or twisting objections, and marked limitations in fine manipulation and overhead reaching in his left hand, but only moderate in his right.  (Tr. 311-12).  Dr. Rion also believed that Tomford's condition interfered with his ability to keep his neck in a constant position.  (Tr. 312).  He stated that Tomford has only bad days and that he is precluded from pushing, pulling, kneeling, bending and stooping.  (Tr. 314).  He found Tomford capable of handling moderate stress, but nevertheless concluded that he could not "see him working."  (Tr. 313).

X-rays taken of Tomford's left foot on May 5, 2011 showed a moderate sized spur off the plantar aspect of the calcaneus.  (Tr. 326).  X-rays taken of his right hand the same day revealed no acute fracture or dislocation and "fusion of the distal interphalangeal joint of the first digit," as well as "osseous density adjacent to the distal phalanx of the first digit [possibly] related to old trauma."  (*Id.*).

### ii.   Dr. Vincent Rampersaud

Tomford began treating with Dr. Vincent Rampersaud on December 9, 2010.  (Tr. 338). Tomford reported increasingly severe back pain that began "years ago" when he was hit by a car on a motorcycle.  (*Id.*).  He reported severe pain at the sight of the previous amputation and reattachment of his right thumb, and left hand pain and lack of usefulness due to a prior injury. (*Id.*).  He rated his back pain at 9/10 and radiating down his legs.  (*Id.*).  His pain increased with working, lifting, standing and sitting and was relieved with lying down and medication.  (*Id.*). An exam revealed Tomford was in moderate distress and had a decreased range of motion and deformity of his left elbow, as well as numbness in the ulnar distribution.  (*Id.*).  Tomford's left hand also had limited motion.  (*Id.*).  However, Dr. Rampersaud noted full motor strength in all

four extremities. (*Id.*). He diagnosed Tomford with lumbago, cervicalgia, and joint site pain, managed his medications and recommended a follow up in one month. (Tr. 339).

At a follow-up on January 6, 2011, Tomford reported left elbow pain and neuropathy, as well as neck and low back pain. (Tr. 335). He also complained of itching. (*Id.*). An exam revealed no new findings and Dr. Rampersaud managed Tomford's medications. (Tr. 335-36). At a follow-up on February 3, 2011, Tomford complained of pain in his right little metacarpal and pain and stiffness in his left hand. (Tr. 333). His pain level was 8/10. (*Id.*). The exam only found that Tomford had full strength in all extremities. (*Id.*). He was newly diagnosed with chronic pain syndrome and his medications were managed. (*Id.*). Treatment notes from an appointment on March 3, 2011, showed the same complaints and the same exam results. (Tr. 332). The only difference is that at this appointment Dr. Rampersaud suggested that Tomford "consider to start physical therapy." (*Id.*).

At an appointment on March 30, 2011, Tomford continued to have the same complaints as his prior two appointments. (Tr. 353). His exam results were also unchanged. (*Id.*). Dr. Rampersaud increased Tomford's hydromorphone at this appointment and recommended physical therapy. (*Id.*). Tomford's treatment notes were ostensibly a carbon copy at his appointment on April 27, 2011, although Dr. Rampersaud did not increase his medication dosage at this appointment. (Tr. 350). Again physical therapy was recommended, as well as an EMG. (*Id.*). At a follow-up appointment on May 25, 2011, Tomford complained of a spur on his heel and pain in his little finger on his right hand. (Tr. 346). His finger was found to be tender, but with full range of motion. (*Id.*). The remainder of the exam notes are illegible. (*Id.*). He was diagnosed with foot pain, right hand pain, right thumb and little finger pain and left arm pain. (*Id.*). Physical therapy was prescribed 3-4 times a week and labs were ordered. (*Id.*). He was

11

found to have limited activity in his left hand.  (*Id.*).

On June 27, 2011, Dr. Rampersaud penned a letter stating that "Jeffrey Tomford per my opinion is considered completely disabled."  (Tr. 355).

### iii.    Medical Evidence After Date of ALJ Decision

A number of treatment records in the file deal with a time period occurring after the date of the ALJ's decision, including two more medical source statements from Drs. Rion and Rampersaud, and a surgical consultation and medical source statement from hand surgeon Dr. Richard Singer.  (*See e.g.* Tr. 363-68; 375-80; 382-98).  While none of this evidence was before the ALJ, the Court discusses it here to the extent it determines the evidence should nevertheless be considered on remand.

An EMG study was conducted on October 20, 2011.  (Tr. 368).  An exam revealed a limited cervical range of motion, but no pain.  (*Id.*).  There was "significant atrophy and weakness of the entire left upper extremity, especially in the distal muscles" but "no significant abnormality on the right upper extremity, except for a positive Tinel's sign at the carpal tunnel." (*Id.*).  The doctor noted some arthritic hand changes.  (*Id.*).  An EMG of the right upper extremity "showed some loss of motor units and increased polyphasia in the thenar muscles." (*Id.*).  Nerve conduction velocity studies showed moderate prolongation of the right median motor and sensory distal latencies."  (*Id.*).  The doctor noted that while these findings were compatible with moderate right carpal tunnel syndrome he did not "think that the pain is coming from this moderate carpal tunnel syndrome, and he has some arthritic changes from overusing his right upper extremity, over time."  (*Id.*).

X-rays taken on November 7, 2011, of Tomford's cervical spine found mild to "moderate degenerative disc disease" at C3-C7, "diffuse multilevel facet joint degenerative changes, mild in

degree, most prominent at C4-C6," and that "the right neural foramina was fairly well patent while the left was mildly narrowed" at C5-C7.  (Tr. 363).  X-rays taken the same day of his lumbar spine revealed "mild degenerative disc disease" at L1-L4 and L5-S1 with "disc height narrowing and endplate degenerative changes," but "no spondylosis or spondylolisthesis."  (Tr. 364).  There were "facet joint degenerative changes at L4-L5 particularly on the right."  (*Id.*).  A right wrist x-ray found "mild degenerative joint disease of the carpal-metacarpal thumb joint with joint space narrowing and minimal osteophytosis."  (*Id.*).  A right hand x-ray found an "osseous fusion of the interphalangeal joint of the thumb," and "a chronic ununited fracture deformity of the terminal phalanx of the thumb" likely "due to old trauma."  (Tr. 365).  It also found "mild degenerative joint disease of the carpal-metacarpal joint of the middle finger with joint space narrowing and minimal osteophytosis" and "minor osteoarthritis at the DIP joints of the index and middle fingers with minor degenerative spurring."  (*Id.*).

On January 25, 2012, Tomford was referred by Dr. Rampersaud to Dr. Richard Singer, a hand surgeon, for an evaluation.  (Tr. 366-67).  An exam revealed that Tomford was unable to abduct his left hand, and had "decreased sensation of the thumb, index finger, middle finger, and half of the ring finger on the left."  (Tr. 366).  He also noted "some intrinsic wasting, but his thenar muscles are wasted consistent with his median nerve palsy."  (*Id.*).  An exam of the right hand revealed "a negative median nerve compression sign and Phalen test" despite the fact that Tomford complained of "numbness intermittently and wears a brace."  (*Id.*).  Dr. Singer concluded that Tomford had "median nerve palsy secondary to a probable supracondylar fracture of his humerus."  (Tr. 367).  Dr. Singer recommended a wrist brace for Tomford's right hand. (*Id.*).  He opined that Tomford had "lost the industrial use of his left arm at this point because of sensation and weakness and because of loss of median nerve function."  (*Id.*).  He opined that he

13

"would disable his left upper extremity and limit his right." (*Id.*).

Dr. Singer filled out an "upper extremity impairment questionnaire," mirroring his findings above. (Tr. 375-80).  He gave a poor prognosis for Tomford's left hand and a guarded one for his right.  (Tr. 375).  He noted that Tomford had reduced grip strength, loss of sensation and loss of fine coordination in both extremities, and cited two recent EMG results in support. (Tr. 375-76).  He noted Tomford's symptoms as being poor grip in his right hand and no grip and muscle wasting in his left.  (Tr. 376).  He found that Tomford could occasionally lift and carry up to 10 pounds with his right hand, and only 5 with his left.  (Tr. 377).  He could not keep his neck in a static position, and his symptoms would increase if he were required to perform repetitive reaching, handling or fingering.  (Tr. 378).  Dr. Singer found that Tomford was markedly limited in his ability to grasp, turn, or twist objects, engage in fine manipulation or reach with his left arm, and moderately limited to these activities with his right arm.  (Tr. 379). He opined that Tomford had good days and bad days and that his industrial and computer use of his left hand was lost.  (*Id.*).  Dr. Singer also found that Tomford could not push or pull, and that these limitations in the questionnaire applied as early as 1972.  (Tr. 380).

On August 10, 2012, Dr. Rion completed a medical source statement diagnosing Tomford with chronic back pain, traumatic injury to his left median, ulnar and radial nerves with severe left arm weakness, right moderate carpal tunnel syndrome, status post amputation and reattachment and fusion of right thumb, and arthritis in his neck, lumbar spine, and right wrist. (Tr. 382).  He also had a heel spur.  (*Id.*).  Dr. Rion noted that these conditions "will get slowly worse."  (*Id.*).  Dr. Rion found that Tomford could sit and stand/walk for only one hour each, and must do so at will, changing positions ever 15-20 minutes.  (Tr. 384).  He could occasionally lift and carry up to 5 pounds, had minimal limitation in grasping objects, fine manipulations and

14

overhead reaching with his right arm, but marked limitations with his left.  (Tr. 385-86).  He found Tomford's condition would be exacerbated by being placed in a competitive work environment and that he could not hold his head in a static position.  (Tr. 387).  His pain and other symptoms would frequently interfere with his attention and concentration.  (*Id.*).  Dr. Rion also found that Tomford would need unscheduled work breaks of 10 minutes at a time throughout the day to rest, and that he only had bad days and worse days.  (Tr. 387-88).  In addition, Tomford could not pull, push, kneel, bend or stoop.  (Tr. 388).

On September 5, 2012, Dr. Rampersaud completed a medical source statement finding that Tomford suffered from lumbago, chronic pain syndrome, pain involving paralysis in his right hand, and left arm, and carpal tunnel syndrome.  (Tr. 391).  He found Tomford could sit for one hour a day and stand or walk for less than that, and could do neither constantly.  (Tr. 393-94).  He could occasionally lift up to 5 pounds and had marked limitation in grasping objects, fine manipulations and overhead reaching in his left arm, but minimal limitations in his right.  (Tr. 394-95).  Dr. Rampersaud found that Tomford's symptoms would increase in a competitive work environment and that his pain would constantly interfere with his attention.  (Tr. 395-96).  He found Tomford incapable of handling even low stress environments, nothing that his pain "tends to be exacerbated by psychological issues."  (Tr. 396).  He would need daily rest breaks of 15 minutes at a time, he had good and bad days, and he would be absent from work more than three times a month due to symptoms.  (Tr. 396-97).  He could not push, pull, kneel, bend or stoop.  (Tr. 397).  Dr. Rampersaud opined that these conditions existed since at least 2006.

### b.    *Consultative and Non-Examining Sources*

A psychiatric review technique was completed on September 14, 2010 by Dr. Blaine Pinaire, which found that despite Tomford's admitted use of Xanax for anxiety, there was no

evidence that he suffered from any severe mental impairment.  (Tr. 62-63).

>    4.    *Vocational Expert's Testimony*

VE Annette Holder testified at the hearing.  (Tr. 49).  She testified that Tomford's past work as a welder was skilled and medium in exertion.  (*Id.*).  His work as an assembler was also skilled but heavy in exertion.  (Tr. 50).  The ALJ then asked the VE to consider a hypothetical claimant of Tomford's age, educational level, and vocational experience, who was capable of

> work, which is simple and unskilled.  Can lift or carry 10 pounds frequently and 20 pounds occasionally, using primarily his right upper extremity with guidance assistance of his left upper extremity.  Can stand and/or walk with normal breaks for a total of six hours in an eight-hour workday, but can do so for only 15 minutes to a half-hour at one time.  Can sit with normal breaks for a total of six hours in an eight-hour workday, but can do so for only 15 minutes to a half hour, one time.  Can perform pushing and pulling motions with the right upper and lower extremities within the aforementioned weight restrictions.  But can only occasionally do so with the left upper extremity.  No overhead reaching with the left upper extremity. Can perform . . . activities requiring manual dexterity for both gross and fine manipulation with handling and reaching with the right hand, but can only do so 50 percent of the workday with the . . . left upper extremity.  Needs to avoid vibrations, can perform each of the following postural activities occasionally.  Climbing stairs with handrails, balancing, stopping, crouching, kneeling, crawling, but needs to avoid climbing ladders, scaffolds and ropes.  And . . . needs to avoid crawling.

(Tr. 51).  The VE testified that such an individual could not perform Tomford's past relevant work, but that there were other jobs in the regional economy that such an individual could perform, including sorter (1,200 jobs in the regional economy) and information clerk (1,300 jobs).  (Tr. 51).

The ALJ then modified the hypothetical to limit the claimant to sedentary work, which further restricts the claimant to only two hours of standing or walking.  (Tr. 52).  The VE testified that such an individual could perform the jobs of inspector (1,100 jobs in the region), packer (1,000 jobs) and reception clerk (1,300 jobs).  (*Id.*).  The ALJ then added limitations that

the claimant would be off task one hour a day due to his impairments.  (Tr. 53).  The VE testified that this would preclude competitive employment.  (*Id.*).  The VE similarly testified that a person who would be absent more than 2 days a month would not be able to work.  (*Id.*).

Tomford's counsel asked the VE if any of the jobs previously identified could be performed with only one hand.  (Tr. 54).  The VE testified that the positions of sorter, reception clerk and information clerk could, but the packer position would be eliminated.  (*Id.*).

## C.  Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

17

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Tomford was not disabled.  At Step One he determined that Tomford had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 23).  At Step Two he found that Tomford suffered from the following severe impairments:

> mild to moderate degenerative changes of the thoracic and lumbar vertebral column; degenerative disc disease on the cervical spine at C3-C4 and C4-C5 with associated marginal tipping with encroachment in the exi[s]ting foramina; history of left elbow fracture requiring surgery in remote past with forearm muscular atrophy with moderately severe left ulnar mononeuropathy with loss of ulnar sensory function and moderately impaired motor function; mild osteoarthritic changes of the left hand involving distal interphalangeal joints as well as the first metacarpal phalangeal joint; bony ankylosis at the distal interphalangeal joint of the thumb of the right hand; hypertension, hyperlipidemia and left foot spur on the plantar aspect of the calcaneus.

(*Id.*).  At Step Three the ALJ determined that none of Tomford's impairments, either alone or in combination, met or medically equaled a listed impairment, specifically comparing his conditions against Listings 1.02 and 1.04.  (Tr. 24).  The ALJ next assessed Tomford's residual functional capacity ("RFC"), finding him able to

lift and/or carry up to ten pounds frequently and twenty pounds occasionally (with respect to the twenty pounds occasionally, using primarily his right upper extremity with guidance assistance of the left upper extremity); he can stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday, but can do so for only fifteen to thirty-minutes at one time and he can sit (with normal breaks) for a total of six hours in an eight-hour workday, but can do so for only fifteen to thirty-minutes at one time. Furthermore, the claimant can perform pushing and pulling motions with the right upper extremity and lower extremities within the aforementioned weight restrictions, but can only occasionally do so with the left upper extremity; he can do no overhead reaching with the left upper extremity; he can perform activities requiring manual dexterity for both gross and fine manipulation with handling and reaching with the right hand, but can only do so for fifty-percent of a typical eight-hour workday with the left hand; he must avoid vibrations; he is limited to only occasional climbing of stairs with handrails; balancing, crouching and kneeling; he must avoid crawling; he must avoid climbing ladders, scaffolds or ropes and he requires work that is simple and unskilled.

(*Id.*). In formulating this RFC, the ALJ gave little weight to the medical opinions of both Drs. Rion and Rampersaud, and gave no weight to an RFC issued by a single decision maker, as it was not the opinion of an acceptable medical source. (Tr. 28-29). At Step Four, the ALJ found that Tomford could not perform his past relevant work. (Tr. 30). However, at Step Five, based on Tomford's age, education, vocational experience and RFC, and coupled with the VE testimony, the ALJ found that there were a significant number of other jobs in the national economy that Tomford could still perform. (Tr. 30-31). Therefore, Tomford was found not disabled. (Tr. 31).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

19

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is

20

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.   Analysis

Tomford alleges two particular errors on appeal.  First, he argues that the ALJ failed to follow the treating physician rule in weighing Dr. Rion's opinion.  He further argues that the ALJ erred in his credibility determination.  Because the Court agrees that the ALJ erred in his application of the treating physician rule and his subsequent RFC analysis, it does not address Tomford's credibility argument.

#### 1.   Dr. Rion's Opinion

Tomford first argues that the ALJ did not give good reasons for refusing to give controlling weight to Dr. Rion's opinion about his limitations.  An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).  The ALJ must give good reasons,

supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ gave Dr. Rion's opinion "little weight" and gave numerous reasons for his decision. (Tr. 28). He first found that Dr. Rion's opinion that Tomford is disabled is a conclusion that "is within the special purview of the Commissioner." (*Id.*). He further found that Dr. Rion's treatment of Tomford had been "somewhat sporadic" and that his treatment notes had not noted any exams "since at least July 2010." (*Id.*). The ALJ also found that Dr. Rion's own notes do not support a finding that he cannot sit, stand or walk more than a total of 4 hours in a day, noting that his opinion was based on "back pain, arthritis of the thumb [and a] severe nerve injury [in the] left arm and hand." (*Id.*). The ALJ further found that Dr. Rion's opinion that Tomford could not grasp, turn or twist objects with either of his upper extremities and no manipulating with his left upper extremity "is not consistent with the objective evidence of record, which indicates that the claimant has only 'moderately impaired motor function' in the left arm." (*Id.*). The ALJ found that these inconsistencies led "to the conclusion that Dr. Rion's opinion of extreme functional limitations is based largely upon the claimant's subjective complaints of pain." (*Id.*).

Tomford takes issue with these reasons, arguing that Dr. Rion's opinion was supported by objective medical evidence that he himself cited, namely x-rays and EMG findings, none of which the ALJ took issue with. He also argues that the ALJ improperly substituted his lay opinion of the raw medical data for the opinion of a treating physician. While the Court finds

that the ALJ validly rejected Dr. Rion's opinion on the ultimate issue of disability, 20 C.F. R. § 404.1527(e)(1), (e)(3), and gave valid reasons for *discounting* Dr. Rion's opinion, it agrees with Tomford that the ALJ erred in failing to afford the opinion any deference as to many of Tomford's functional abilities, despite the absence of any other functional medical opinion of record, and in relying on his own interpretation of the medical data to formulate his RFC.

     <u>Where</u> the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must still give some deference to that opinion.  As explained in SSR 96-2p:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CRF 404.1527 and 416.927.  *In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.*

SSR 96-2p, 1996 SSR LEXIS 9 (July 2, 1996) (emphasis added).  Here, while the ALJ gave good reasons for refusing to give Dr. Rion's opinion controlling weight, and informed the Court and Tomford of the ultimate weight he gave it, the problem is that given the absence of any other medical opinion assessing Tomford's functional limitations, if the ALJ was not going to adopt Dr. Rion's opinion, or find credible Tomford's own subjective testimony regarding his functional limitations, he should have ordered an additional medical source opinion of Tomford's RFC. Instead, the ALJ assessed Tomford's RFC limitations based on what the Court can only surmise was his own interpretation of the medical evidence, as most of the findings were not congruent with the limitations imposed by Dr. Rion or testified to by Tomford himself, and there were no other functional limitation findings in the file, either from a treating or consulting physician.

     For example, the ALJ concluded that Tomford could do a limited range of light work that

included (among other things) sitting six hours a day and standing for the same amount of time, (albeit with a sit-stand option) lifting ten pounds frequently, pushing, pulling and overhead reaching with his right arm, (with occasional pushing and pulling with his left arm), performing fine manipulations with his left arm 50% of the time, and occasionally kneeling.  (Tr. 24).  But Dr. Rion's opinion does not permit any of these activities – and in fact specifically prohibits many of them – and no other opinion exists in the record to support the conclusion that Tomford can engage in this level of activity.  (Tr. 308-315).[1]  While the Court recognizes that the duty of formulating the RFC "is reserved to the Commissioner" (20 C.F.R. § 404.1527(d)), Courts have consistently cautioned ALJs against attempting to rely "on their own expertise in drawing RFC conclusions from raw medical data," which is what the ALJ appears to have done in this case. *Allen v. Comm'r of Soc. Sec.*, No. 12-15097, 2013 U.S. Dist. LEXIS 150236, *44-45 (E.D. Mich. Sept. 13, 2013) *adopted by* 2013 U.S. Dist. LEXIS 149851 (E.D. Mich. Oct. 18, 2013) (collecting cases).

Because Dr. Rion is the only medical opinion in the record to assess Tomford's functional limitations, and because the ALJ ultimately gave little weight to that opinion and did not incorporate the bulk of its limitations into his RFC, "we are left with the circumstance of the ALJ interpreting raw medical data to arrive at a residual functional capacity determination, without the benefit of an expert medical opinion."  *Allen*, 2013 U.S. Dist. LEXIS 150236 at *43; *see also Zaft v. Comm'r of Soc. Sec.*, No. 12-13415, 2013 U.S. Dist. LEXIS 136608 (E.D. Mich. Aug. 19, 2013) *adopted by* 2013 U.S. Dist. LEXIS 135416 (E.D. Mich. Sept. 23, 2013) (same); *Blythe v. Astrue*, No. 08-00104, 2009 U.S. Dist. LEXIS 38051 (W.D. Ky. Jan. 13, 2009) ("There

---

[1] Indeed, Tomford's own subjective reports and testimony was that he could lift only 10 pounds, and even then required his left hand for support of his right when lifting that amount.  (Tr. 43-44).  He also testified that he can only do tasks around the house for 10-15 minutes at a time before needing to rest.  (Tr. 47).

must be some medical support for the ALJ's physical RFC finding because as a lay individual an ALJ is simply not qualified to interpret raw medical data in functional terms.") (internal citations omitted). "Under these circumstances, the ALJ's RFC lacks any support whatsoever and remand is necessary because the ALJ improperly relied on this determination to conclude that [Tomford] can perform a number of jobs in the national economy." *Id.* at \*49; *Zaft*, 2013 U.S. Dist. LEXIS 136608 at \*42. Thus, this case should be remanded to permit the ALJ to obtain a proper medical source opinion and re-determine Tomford's RFC in light of that opinion. In doing so, the ALJ should also consider the medical evidence submitted to the Appeals Council after the date of his original opinion, which contains additional x-ray and EMG results, as well as three medical opinions from Drs. Rion, Rampersaud, and Singer.

In sum, while a finding that Tomford is not disabled under the Act may still be appropriate in this case, especially in light of the apparent lack of examinations performed by his treating physicians, such a finding cannot be premised upon the current record as evaluated by the ALJ; as a result of the ALJ's ostensible rejection of Dr. Rion's opinion, the present record lacks an adequate medical opinion upon which the ALJ could assess Tomford's functional limitations. Thus, for the reasons set forth above, the Court recommends that the case be remanded for further proceedings and consideration consistent with this Recommendation.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Tomford's Motion for Summary Judgment **[9]** be **GRANTED IN PART** to the extent is seeks remand for further consideration, but **DENIED IN PART** to the extent it seeks an award of benefits, the Commissioner's Motion **[13]** be **DENIED** and this case be **REMANDED** for further proceedings and consideration consistent with this Recommendation.

25

Dated: February 9, 2014                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 9, 2014.

                                                 s/Felicia M. Moses
                                                 FELICIA M. MOSES
                                                 Case Manager